UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| Isaiah Jones,<br>Plaintiff,<br><br>vs.<br><br>Epic Games, Inc., Sony Entertainment Interactive LLC, Microsoft Corporation, and Mojang AB,<br>   Defendants. | No.<br><br>   COMPLAINT AND DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff Isaiah Jones hereby brings this action against the above-captioned Defendants (hereinafter collectively referred to as "Defendants") Sony Entertainment Interactive LLC, and Epic Games, Inc., Microsoft Corporation, and Mojang AB, to recover damages arising from the severe injuries sustained because of Plaintiff's use of Defendant's video game products. In support thereof, Plaintiff alleges and states:

## INTRODUCTION

1.  Many modern video games are fun and engaging adventures that allow players to immerse themselves in the gameplay and the world of the game. However, there are some video games that pose serious, known risks to players. This litigation seeks to hold each Defendant accountable for failing to warn and failing to include available safeguards against the known risks associated with excessive use of their video games products and choosing instead to implement programming that both caused and amplified these risks in order to increase Defendants' profits.

2.  Defendants are aware that the more time a player spends on their respective game or platform, the more likely it is that said player will make in-game purchases, thereby increasing Defendants' revenues.

3.  Defendants are also aware that for more than four decades scientists have known about and have studied video game addiction.[1] Furthermore, Defendants are aware that for nearly two decades, science has shown that prolonged use of video games can result in brain damage, cognitive decline, and physical and emotional deficits. These issues are magnified if the player is a minor or is neurodivergent.

4.  Despite being fully aware of these risks, Defendants marketed their respective games – Fortnite, Minecraft, the Xbox Platform, and the PlayStation Platform (hereinafter the "Products") – without implementing simple safety features, such as adequate parental controls, warning or opt-in limits on the time players can spend in game.

5.  Instead, Defendants chose to add features to their Products that they knew would be addictive in order to maximize time spent in their respective games and platforms, thus improving the odds of players making in-game purchases, and thereby increasing Defendants' profits.

6.  Defendants' strategies have been extremely lucrative. As a result of Defendants' inclusion of addictive features in their respective Products, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis of minors and young adults suffering from addiction to and disordered use of video games.

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

7. Defendant Sony's PlayStation video game platform is where Plaintiff played the other Defendants' games. As described herein, Defendant Sony designed its PlayStation platform with gamified features that caused and further exacerbated addiction and disordered relationships with video games.

8. Defendant Microsoft's Xbox video game platform is where Plaintiff played the other Defendants' games. As described herein, Defendant Microsoft designed its Xbox platform with gamified features that caused and further exacerbated addiction and disordered relationships with video games.

9. As set forth below, and as each Defendant expected and intended from their decision to add addictive and manipulative programming to their Products instead of safety features, Plaintiff became addicted to Defendants' Products and developed a disordered relationship with video games. As a result, Plaintiff suffers from mental, physical, and economic injuries, including diminished social interactions, lack of interest in other hobbies, withdrawal symptoms such as rage, anger, and physical outbursts. Through this lawsuit, Plaintiff seeks to hold Defendants accountable for their decision to place profits over safety, which directly and proximately resulted in Plaintiff's harm.

## PARTIES

### I. Plaintiff Isaiah Jones

10. Plaintiff, Isaiah Jones is, and at all times relevant to this action was a citizen and resident of the State of Maryland whose principal place of residence is Columbia, Howard County, MD.

11. Plaintiff began playing Defendants' Products at approximately 10 years old. Since that time, Plaintiff has used and/or continues to use Defendants' Products at an increasing,

3

uncontrollable, compulsive, and/or addictive pace. Plaintiff has been injured and damaged and continues to be injured and damaged, as a result of Plaintiff's use of Defendants' Products.

## II. Defendant Epic Games

12.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland Corporation with is principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

13.     Epic Games is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform either directly or indirectly, to members of the general public within the State of Maryland, including to Plaintiff.

## III.       Defendant Sony Interactive Entertainment, LLC

14.      Sony Interactive Entertainment, LLC ("Sony") is a California corporation with its principal place of business at 2207 Bridgepointe Pkwy, San Mateo, CA 94404.

15.     Sony is a video game developer, manufacturer, and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the PlayStation platform – on which the other Defendants' Products were played – to members of the general public within the State of Maryland.

## V. Defendant Microsoft Corporation

16.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

17.     Microsoft is video game developer and publisher that, at all times hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled,

prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the State of Maryland, including Plaintiff.

18.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox platform to members of the general public within the State of Maryland.

**VI. Defendant Mojang**

19.    Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

20.    Mojang is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the State of STATE, including to Plaintiff.

21.    In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly owned subsidiary of Defendant Microsoft.

22.    Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing assembly, manufacture, publishing, packaging, labeling, preparation, distribution, marketing, supply and/or sale of the Minecraft video game series that Plaintiff began playing. Indeed, both Mojang and Microsoft are responsible for the

addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

## JURISDICTION AND VENUE

23.     Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

24.     This suit alleges of action seeking relief arising under the laws of the State of Maryland, including but not limited to allegation that as a direct and proximate result of Defendants' Products and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations and misrepresentations, including by omission, Plaintiff suffered and continues to suffer injuries and damages within the State of Maryland.

25.     This Court has personal jurisdiction over Defendants Sony because routinely conducts business in Maryland and has sufficient minimum contacts in Maryland, stemming from their activities whereby they have purposefully and intentionally availed themselves of this jurisdiction and the benefits and protections of the laws of the State of Maryland by marketing video game Products and transacting business in the States of Maryland.

26.     This Court has personal jurisdiction over Defendants Microsoft because routinely conducts business in Maryland and has sufficient minimum contacts in Maryland, stemming from their activities whereby they have purposefully and intentionally availed themselves of this jurisdiction and the benefits and protections of the laws of the State of Maryland by marketing video game Products and transacting business in the States of Maryland.

27.     This Court has personal jurisdiction over Defendant Epic Games because Defendant routinely conducts business in Maryland and has sufficient minimum contacts in Maryland, stemming from their activities whereby they have purposefully and intentionally

availed themselves of this jurisdiction and the benefits and protections of the laws of the State of Maryland by marketing video game Products and transacting business in the States of Maryland.

28.    Venue is proper in this County because one of the Plaintiff resides in Maryland and Defendants routinely conduct business in the State of Maryland.

## GENERAL FACTUAL ALLEGATIONS

29.    In 2023, 65% of Americans of all ages played video games every week.[2] In 2024, experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and 73% of girls reporting video game usage.[3] Further, more than 90% of children older than two years old play video games, and "[c]hildren 8to 17 years of age spend an average of 1.5 to 2 hours daily playing video games."[4] This research dramatically emphasizes the idea that video game usage has become fundamental in the life of an American child.

### I. Gaming Addiction Is a Recognized and Diagnosable Condition

30.    Addiction to and disorder use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[5] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness,

---

[2] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023), https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.

[3] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.

[4] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

[5] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or using video games is removed, precluded or reduced; (3) Tolerance – the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of spent playing or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationship due to playing and/or using video games.

31.    As of 2022, "Gaming disorder" – disordered use of and/or play with video games – is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[6] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming", which may be online or offline, manifested by: impaired control over gaming (e.g. onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

**II. Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits.**

---

[6] Other disorders found in that subcategory include alcoholism and gambling addiction.

## A. Operant Conditioning

32.     Upon information and belief, modern game developers, including Defendants, utilized child development experts and/or behavioral psychologists to design their games to attract and addict minors and young adults to their Products.

33.     Upon information and belief, the analyses performed by each Defendant's behavioral experts and/or psychologists revealed that when video games that are programmed to incorporate "operant conditioning" a form of behavioral manipulation that targets users' dopamine receptors, the operant conditioning triggers users' desire to hyperfocus on the Products. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

34.     In the context of video games and gaming platforms, video game developers including Defendants, relied on operant conditioning in order to addict players and manipulate them into making profitable decisions for the game developers, such as spending more time playing their respective games and engaging in microtransactions.

## B. Development and Use of Patented Programming

35.     In addition to relying on their own studies to make programming decisions, game developers, including Defendants, help develop, licensed, and otherwise utilized patented programming algorithms in their games and gaming platforms that were intended to addict players, increase time spent in-game, and drive microtransactions. By way of example:

a.  U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendants' at issue here, and can be summarized as a system and method that drives microtransactions in multiplayer video games. The system for driving microtransactions is comprised of a host computer having one or more

physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the ingame item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player.

b.  U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

c.  U.S. Patent No. 10099140-B2 creates a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game". Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content".

36.       Upon information and belief, many games developers, including Defendant, license one or more of the above technology patents, and/or other patents similar thereto, and incorporate said technology into their respective Products with the intention of creating addiction and profits.

**C. Operant Conditioning, Patented Technology, and Game Design Choices Increase Time Spent In-Game and Revenue Generated by Microtransactions**.

37.     Using operant conditioning and patented technology, video game developers, including Defendants, analyze the skill level and behavior of the user and customize their experience to maximize the time spent in-game, during which the user is bombarded with solicitations to purchase additional in-game downloadable game content.

38.     In doing so, video game developers, including Defendants, exploit an information asymmetry between themselves and the user. This allows game developers to, including the Defendants, to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize a user's expenditure of real money.

39.     Likewise, game developers, including Defendants, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during gameplay. Game developers incentivize players that have purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. However, by design, game difficulty is dynamic resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

## V.  Addictive Game Design Features Cause Significant Harm to Minors

40.     Minors, young adults, and neurodivergent players are most vulnerable to methodologies described above. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games to exploit that vulnerable population, causing injury and detriment, including to Plaintiff.

41.     Each Defendant knew or was aware, or should have known and should have been aware, that their respective Products were dangerous and harmful to users when used as

intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop Products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer and longer periods of time.

42.     There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's Products at the time they are purchased to allow prospective users to make informed decisions as to whether using the Products are desirable, appropriate, safe, or worth the potential risk.

43.     Each Defendant targeted consumers/purchasers and specifically including Plaintiff herein, to use their respective Products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

44.     Each Defendant targeted Plaintiff with manipulative programming to prolong use of their Products in hopes of engaging Plaintiff in microtransactions during their use of the Products. As a result of Plaintiff's use of each Defendant's intentionally addictive Products Plaintiff was injured and damaged as herein alleged.

**VII. Minecraft**

**A. Minecraft Gameplay Basics**

45.     Minecraft is a 3D sandbox game that can be played on PC, gaming consoles, and mobile devices. Gameplay involves the user's character collecting resources, exploring the

Minecraft world, crafting items, and trying to survive. The Minecraft world is virtually infinite and is generated based on the player's exploration.

46.    There are multiple game modes, including survival mode and creative mode. Players in survival mode must gather resources to build structures and maintain their health while avoiding attacks from monsters. Players in creative mode have access to unlimited resources they can use to craft items or create structures.

47.    Minecraft users are encouraged to join different "worlds," which can include multiplayer or single-player world depending on what kind of world the player enters. To generate a world to play in, players utilize "seeds" or specially built computer codes. Once a player enters a seed, the code creates a unique world for the user to explore.

48.    In order to play Minecraft, users must purchase the game and create a Minecraft account. To create a Minecraft account, users must input a pre-existing Microsoft account, or create a Microsoft account, and choose a password. Users of any age can create a Minecraft account. There is no age verification upon sign-up on the Minecraft website.

49.    Minecraft has its own form of currency called "Minecoins." One Minecoin is worth less than one US dollar. Minecoins can only be purchased with real currency.

50.    Minecoins can be used to purchase various in-game features such as new skins for the user's avatar, "texture packs" that change the appearance of building blocks within the game, "mash-up packs" that allow users to enter themed worlds with special textures and skins, mini games, and access to new adventures via adventure maps.[7]

**D. Minecraft was Designed with Intentionally Addictive Features**

---

[7] *Minecraft Marketplace*, Minecraft, https://www.minecraft.net/en-us/marketplace (last accessed Jan. 15, 2026)

51.     Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists and behavioral experts to work on Minecraft development.

52.     Microsoft and Mojang designed Minecraft with psychological tactics to take advantage of the chemical reward system of a player's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

53.     For example, Microsoft and Mojang created specific in-game reward system known as "advancements" or "achievements" in order to incentivize players to engage in repeated and prolonged session playing Minecraft.

54.     In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP", which are used like a currency to enhance the user's in-game equipment and reach new levels of the game.

55.     In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

56.     Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless of hours across many

days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

57.    The use of rewards systems, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse, addiction, and compulsive use of its Product by foreseeable users can lead to brain damage, abuse, compulsive use, addiction and other injury.

## IX.  Microsoft's Xbox and Xbox Products

### A. Xbox Product Basics

58.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as online video gaming through the Xbox Network, Xbox Game Pass, and Xbox Cloud Gaming.

59.    Each version of the Xbox console provides users with the ability to play video games using a hard copy of the video game, a digital copy downloaded from the Microsoft Store (hereinafter "Xbox Store"), using Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass or Cloud Gaming.

60.    Microsoft developed and maintains the Xbox Store – a product-platform through which users can purchase thousands of games to be stored on their console through digital download and for use with its Xbox consoles.

61.    Though third-parties create the games available in the Xbox Store, Microsoft profits from all monetary transactions that occur within the store, taking thirty percent of

revenue from sales of third-party console games.[8] Likewise, Microsoft profits from all monetary transactions that occur within the third-party games on its Xbox Platform.

62.    The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

**B. Microsoft Employs a Game-Like Achievement System on Its Platforms that Causes and/or Exacerbates Compulsive Game Use.**

63.    Microsoft knows that third-party games targeted to vulnerable individuals are available on its Xbox Platform. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addict such users.

64.    Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[9]

65.    Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed its Xbox achievement system to keep users compulsively and addictively engaged with its platform.

66.    For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system. Xbox achievements are a game-like program that tracks the amount of time a player spends in third-party games on the Xbox platform and the player's actions within those games.

---

[8] Tom Warren, *Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming*, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.
[9] *See Xbox Research*, Microsoft, https://www.microsoft.com/en-us/research/group/xbox-research/ (last accessed Jan. 16, 2026) ("Our team members have a diverse set of backgrounds including cognitive psychology, social psychology, interaction design, human factors, ethnography, and neuroscience.")

67.      Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days. Similarly, Fortnite includes the "Talented Builder" achievement for building 500,000 structures within the game.

68.      Within each user's Xbox profile, an "achievements" tab displays each game where the user has obtained an achievement. Within the achievements tab, each game shows the percentage of other players who have unlocked the same achievement.

69.      When these achievements are earned, *Microsoft* notifies the player with a console-based message. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment.

70.      Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen in-game indicates the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

71.      In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

72.      While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft created the Xbox achievement system in order to incentivize extended and continued gameplay on its

platform, resulting in more purchases in-game or of third-party games, all of which increase Microsoft's profits.

73.     Microsoft's Platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warning labels, banners or messaging information users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform at account setup or at any time during usage.

## X. Fortnite

### A. Fortnite Gameplay Basics

74.     Released in 2017, Fortnite is a free online video game and game platform designed, developed, and published by Epic Games.

75.     Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 players fight in a progressively shrinking area to be the last person standing. Players can play alone, in a due, or in a "squad" of 3-4 players. When users are "dropped into" the game arena, the player must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.

76.     The other two modes for Fortnite are Fortnite: Save the World and Fortnite Creative. Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four players fight off zombie-like creatures and defend objects with traps and fortifications they can build. Save the World is the only pay-to-play mode of the Fortnite franchise. Fortnite Creative is a sandbox game mode in which players are given complete

freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

77.     Each of Epic Games's herein listed Fortnite Products has similar graphics, art assets, and game mechanics.

78.     Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

79.     Fortnite includes a feature called a "Battle Pass", which is the same feature as a "season pass" described above. Compl. ¶ 75. The Battle Pass in Fortnite allows players to earn various rewards by "leveling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[10] The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic games through the purchase of in-game content.

**C. Fortnite was Designed with Intentionally Addictive Features**

80.     Epic Games knows that players who are susceptible to addiction are using their Products, but designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a player's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

---

[10] *What is the Battle Pass? Where Can I Learn More?*, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-thebattle-pass-where-can-i-learn-more-a000084706 (last visited Jan 9, 2026).

81.     Epic Games actively employs or has employed psychologists and behavioral scientists within its User Experiences department and Online department.[11] Upon information or belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to ensure the addiction of players.

82.     For example, Epic Games designed an achievement system within Fortnite that rewards users for completing various tasks or actions. For example, a player playing Fortnite can unlock an achievement for saving 1,000 survivors in successful missions or completing 1,000 missions. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. Many achievements are difficult to obtain and require hundreds of hours of gameplay to unlock. This system is designed to keep users engaged with the game, incentivize long periods of gaming over many days, and ultimately increase Epic Games' profits.

83.     Epic Games failed to disclose that it designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury.

84.     Epic Games knew that its Fortnite Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe.

---

[11] *See, e.g.*, Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited Jan. 9 2026); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited Jan. 9 2026); *Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games), NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychologyand-user-experience-dr-celia-hodent-epicgames#:~: text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016);* Katelyn Procci, LINKEDIN, *https://www.linkedin.com/in/katelynprocci (last visited Jan. 9, 2026).*

85.     Epic Games misrepresented Fortnite as educational and safe while knowing that abuse, addiction, and compulsive use by players can lead to brain damage and injury and knowing that it had designed and developed Fortnite to be as addictive as possible. Many health experts have concluded that Fortnite is more addictive than heroin and other illegal drugs. [12]

86.     Epic Games did not inform and concealed from the public that Fortnite posed significant risks of harm to users due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use can lead to brain damage and injury.

87.     At account set up, Fortnite's website contains no warning labels, banners, or messaging informing players of the known risks and harms stemming from the excessive use of Epic Games's Product. During gameplay there are no warning labels, banners, or messaging informing players of the known risks and harms stemming from the excessive use of Epic Games's Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

**XI. Sony's PlayStation Products**

**A. PlayStation Product Basics**

88.     PlayStation is a gaming brand, owned and operated by Sony Interactive Entertainment, that consists of PlayStation gaming consoles as well as online gaming through the PlayStation Network.

---

[12] Rachel Ehmke, *A Parent's Guide to Dealing With Fortnite*, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Jan. 9, 2026).

89.     Each version of the PlayStation console provides users with the ability to play video games. Most users of the PlayStation 5 play digital download versions of the game that are purchased through the PlayStation Store on the PlayStation Network[13].

90.     Though third parties create most of the games available through the PlayStation store, Sony profits from all monetary transactions that occur within the store, taking thirty percent of revenue from sales of third-party console games. Likewise, Sony profits from all monetary transactions that occur within the third-party console games played on the PlayStation platforms.

91.     The PlayStation Network is an online multiplayer gaming service. The PlayStation Network includes the PlayStation Store and PlayStation Plus, a gaming catalogue that users can access to rent or temporarily access a massive library of games.

**B. Sony Employs a Game-Like Achievement System on Its Platform that Causes or Exacerbates Compulsive Game Use.**

92.     Sony is aware that third-party games that target users who are susceptible to addiction are available on the PlayStation platforms. Nonetheless, Sony chose to add features to its PlayStation platform that intentionally addict such users.

93.     Sony actively employs or has employed psychologists for user research on its PlayStation platforms.[14]

94.     Upon information and belief, through the use of such psychologists, Sony developed its PlayStation achievement system to keep users compulsively and addictively

---

[13] The ability to play a hard copy of a game in a feature available for additional cost.
[14] *See* Kristie Fisher, PhD https://www.linkedin.com/in/kristie-j-fisher-phd-2216a764/?originalSubdomain=uk (last accessed Jan. 9, 2026); Sue P. https://www.linkedin.com/in/suepacete/ (last accessed Jan. 9, 2026); Jeremy Paragoso https://www.linkedin.com/in/jeremy-paragoso-b50007155/ (last accessed Jan. 9, 2026)

engaged with its platform, despite its knowledge that abuse, addiction, and compulsive use can lead to brain damage and injury.

95.    For example, within its PlayStation Products, Sony developed and implemented a "trophy" system that tracks users' achievements in third-party games. The trophies exist in Bronze, Silver, Gold and Platinum tiers and then in rarity levels such as Common, Rare, Very Rare, and Ultra Rare.[15] These tiers keep players engaged and reward engaging in repetitive behaviors in the games to try and get Platinum and/or Ultra Rare trophies.

96.    Many of the achievements created within Sony's achievement system are met by users spending excessive time in-game. For example, Platinum trophies can only be earned if you've gotten all other trophies in the base game trophy list.[16] This requires a user to completely clear and complete every task within a game in order to achieve the highest trophy.

97.    When a user accesses their PlayStation homepage and selects a game, but doesn't open the game, PlayStation displays a percentage tracker and a trophy tracker. The percentage tracker tells a user what percentage of the game the user has completed and the trophy tracker lists how many trophies a user has earned and how many more trophies are potentially available for the game.

98.    While the achievement system is displayable to friends on the platform, the achievement system was created to incentivize extended and continued gameplay on its platform, resulting in more purchases in-game or of third-party games, all of which increase Sony's profits.

---

[15] https://www.playstation.com/en-us/support/games/how-to-earn-trophies-on-playstation--consoles/ (last accessed Jan. 9, 2026)
[16] https://psnprofiles.com/guide/18274-the-trophy-system-explained

99.     PlayStation does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the PlayStation set up page contains no warning labels, banners, or messaging informing users of the known risks and harms stemming from the use of the PlayStation platform. Users are not provided with information regarding potential physical and mental harm associated with the use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during usage. Users are not provided with information regarding potential physical and mental harm associated with use of its platform.

100.    Sony could, but chooses not to, implement user protections or safeguards, such as user-imposed time limits on gameplay, increased age verification at account setup, and alerts or warnings regarding the known risks of excessive gameplay.

## PLAINTIFF-SPECIFIC ALLEGATIONS

101.    Plaintiff's usage of Defendants' Products is compulsive and disordered, and he is incapable of restraining his own usage. Any attempt to remove Plaintiff from his games is met with severe withdrawal symptoms including anger, destruction of property, compulsive and antisocial behavior, and inability to maintain sleep. Plaintiff's gaming addiction has had an ongoing and significant impact on his life and well-being.

102.    Plaintiff has been injured and harmed as a direct and proximate result of each Defendant's action and misconduct, and for that he is entitled to compensation and other damages under Maryland law.

103.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that damaged and continues to harm Plaintiff and countless others. For this, they should be

punished, and punitive damages should be assessed against each Defendant for the respective misdeeds and unlawful conduct.

104.    Plaintiff never agreed to be harmed or exposed to an addictive Product. Plaintiff never entered into a valid contract with any of the Defendants. Specifically, to the extent that any Defendant claims Plaintiff entered into a contract, any terms to which Plaintiff agreed are void and unenforceable. Each Defendant's terms of service or terms and conditions clauses are contracts of adhesion and have no variation or negotiable terms prior to the signing of parties.

105.    Plaintiff's continued use of Defendants' Products, to the extent such use exists, is compulsive and due to Plaintiff's addiction to using the Products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the Parties.

## PLAINTIFF'S CLAIMS
## COUNT I – STRICT PRODUCT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

106.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

107.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

108.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of the Products. Defendants Products are highly addictive and likely to cause mental and physical injuries as listed above.

109.     Defendants knew, or should have known, that the use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

110.     Defendants knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, and that such use could result in severe physical, mental, and emotional injuries.

111.     Defendant owed a duty to warn consumers of the foreseeable risks and dangers of the Products that the Defendants knew were present but not obvious or known to users or any average member of the consuming public.

112.     Upon information and belief, Defendants failed to include any warning or instructions regarding the herein identified risks and dangers of using Defendants' Products in their intended and foreseeable manner.

113.     None of Defendant's respective Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk harm and addiction to users.

114.     Defendants' Products did not contain a warning when the Products left their possession.

115.     Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a.  Failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

b.  Failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

c. Failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors, particularly in minors and neurodivergent players;

d. Failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

e. Representing that the Product was and is safe for use, when in fact, defendant knew or should have known that its Product was designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Product.

116. Moreover, each Defendant breached its respective duty of care owed to Plaintiff through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products. Those breaches include but are not limited to:

a. Designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

b. Failing to implement effective parental controls;

c. Failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequence or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction compulsive use, or overuse; and

d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending on in-game downloadable Products and upgrade and in-game purchases and/or microtransactions.

117. The failure of each Defendant to adequately warn about their defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

118. Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased or continue to use Defendant's respective Product. Likewise, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Products in order to eliminate or mitigate the risk of harm.

119. As a direct and proximate result of each Defendant's defective products and failure to warn about said Products, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

120. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT II – NEGLIGENCE – DESIGN
### (Against All Defendants)

121. Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

122.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

123.     Defendants knew, or should have known, that the use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

124.     Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Products. By design, these Products are highly addictive and likely to cause mental and physical injuries as listed above.

125.     Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

126.     The Products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in this Complaint, including, but not limited to, the use of operant conditioning in game design, the use of microtransactions in game design, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper age verification, and because the Products created failed to operate as a reasonable user would expect.

127.     Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their Products less addictive and harmful, including but not limited to:

   a.  Robust age verification;

b.  Effective parental controls;

c.  The removal of barriers to the enactment of parental controls;

d.  Warnings of health effects of use and extended use upon account setup;

e.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

f.  Limits for microtransactions; and,

g.  Others as set forth herein.

128.    Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead, Defendants designed Products that aggressively addict users with features that increased addictiveness, use time, frequency of use, and engagement with the Products.

129.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

130.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

131.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as set forth fully here.

132.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

133.     Defendants knew, or should have known, ordinary consumers such as Plaintiff would not have realized the potential risks of the Products.

134.     None of Defendants' Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users. Defendants' Products did not contain a warning of these risks when the Products left their possession.

135.     Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased, used, or continue to use Defendant's respective Product. Likewise, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

136.     Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

137.     Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries.

138.     A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

139.     As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

140.     As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

141.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IV – NEGLIGENCE – ORDINARY
### (Against All Defendants)

142.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

143.     Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff. Defendants' duties include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

144. Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Products into the stream of commerce.

145. Defendants also owed a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users.

146. Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative designs.

147. Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

148. Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

149. Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that users are developing disordered and addicted use.

150. Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, about how and when, if ever, to safely use their Products.

151. Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, the tools to ensure that their Products are used in a limited and safe manner.

152.     As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective Products.

153.     Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

154.     As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

155.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT V – FRAUDULENT MISREPRESENTATION/DECEIT
### (Against All Defendants)

156.     Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

157.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

158.     As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

159.     Defendants designed the Products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use can lead to injury, but concealed this information from the public and Product users, including Plaintiff.

160.     Defendants knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

161.     Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

162.     Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff.

163.     Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

164.     Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone."

165.     Defendant Microsoft stated that "Xbox strives to a safer gaming experience for you and your family," and that its Xbox store is "safer for the whole family" to use.

166. Defendant Sony advertises the PlayStation platform as safe, welcoming, and fun for users of all ages.

167. However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

168. Defendants intentionally failed to disclose to users, including Plaintiff, that their Products are designed to create and sustain addiction in order to entice users to continue gameplay and increase profits.

169. Defendants affirmatively represented that their Products were safe for use while they simultaneously knew that their Products caused addiction and compulsive use.

170. Defendants intended for users, including Plaintiff, to rely on their representations that their Products were safe for use in order to keep users engaging with their Products and increase their profits.

171. Had Plaintiff been aware that the Products could cause significant harm such as aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Plaintiff would not have purchased or used or continue to use Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed Plaintiff, they would have taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

172. Plaintiff reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

173.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content. Because of Plaintiff's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

174.    As direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

175.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VI – FRAUDULENT CONCEALMENT
### (Against All Defendants)

176.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

177.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing

their respective video game Products used by Plaintiff, each of which are defective and unreasonably dangerous.

178.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

179.    Defendants designed the Products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury but concealed this information from the public and Product users.

180.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. Each Defendant knowingly made false statements about the safety of their respective Products.

181.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff.

182.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits.

183.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff been aware that the Products could cause significant harm, Plaintiff would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed Plaintiff, Plaintiff would have

taken precautions when using Defendant's respective Product in order to eliminate or mitigate the risk of harm.

184. As a direct and proximate result of each Defendant's material omissions, Plaintiff had no reason to believe that each of Defendant's Products were unsafe to use.

185. A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff reasonably and justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

186. As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Plaintiff's injuries are permanent and will require more medical care and treatment in the future.

187. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against each Defendant as to each relevant cause of action as follows:

1. For Plaintiff's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2. For Plaintiff's past and future economic and special damages according to

39

proof at the time of trial;

3. For Plaintiff's medical and related expenses according to proof at the time of

trial;

5. For Plaintiff's costs of suit herein;

6. For Injunctive relief;

7. For Attorneys' fees;

8. For exemplary and/or punitive damages according to proof at the time of trial; and,

9. For such other and further relief, whether at law or in equity, that this Court deems

just and proper.


Date: 05/27/2026                              Respectfully Submitted:

                                              _____
                                              Gwen-Marie Davis, Esq.
                                              Fed Bar No.: 29340
                                              GDH Law, LLC.
                                              4200 Parliament Place, Suite 510
                                              Lanham, Maryland 20613
                                              (301) 769-6835
                                              gdavis@gdhlawfirm.com
                                              Counsel for Plaintiff


                                              _____/s/_____
                                              MCSWEENEY LANGEVIN, LLP
                                              Rhett McSweeney
                                              MN Bar ID: 269542
                                              2116 S 2nd Ave
                                              Minneapolis, MN 55404
                                              (612) 746-4646
                                              filing@mclmasstort.com
                                              *PHV forthcoming*